THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* EDWIN CODARRE, Defendant-Appellant.

Second Department, December 16, 1963.

---

*O. John Rogge* for appellant.

*Raymond C. Baratta, District Attorney* (*Peter L. Maroulis* of counsel), for respondent.

BELDOCK, P. J. On August 26, 1943, defendant, then 13 years of age, was indicted for the first degree murder of Elizabeth Voight, then about 10 years old.

The principal question involved is: (a) whether on November 23, 1943, when the defendant pleaded guilty to murder in the second degree, he had a '' plausible defense '' (legal insanity by reason of epilepsy) ; and (b) whether insufficient consideration was given to such defense. If he had such a defense, his present application to vacate the judgment of conviction would have to be granted and a new trial ordered. Such vacatur now would result in a dismissal of the indictment because, while under the law in effect in 1943 the then 13-year-old defendant could have been convicted of murder in the first degree and sentenced to death, under the law in effect since 1948 (L. 1948, ch. 554) he would have to be treated as a juvenile delinquent. Although the 1948 amendment is not retroactive and cannot be applied in favor of an offender tried and sentenced to imprisonment before its enactment (*People* v. *Codarre,* 10 N Y 2d 361), the amendment is applicable to cases tried thereafter, even for offenses previously committed (*People* v. *Oliver,* 1 N Y 2d 152).

It appears that on or about July 21, 1943 defendant began working in the kitchen of a boys' camp in the Town of East

Fishkill, Dutchess County. Shortly after he came to the camp, he met another boy who lived about one and a-half miles away. Defendant visited the other boy twice. On the occasion of the second visit he met the boy's sister, Elizabeth (the girl whom defendant later killed). On that occasion, defendant and the other boy, during the night, broke into a gas station and stole some cigarettes and candy. Defendant stayed at the boy's house overnight; the boy's parents were not at home; defendant '' petted '' with Elizabeth during this visit.

On August 13, 1943 defendant went to the boy's house, intending to play with him. The boy was not home, but Elizabeth was. While Elizabeth and defendant walked along a country road in the direction of the farm where her brother happened to be, defendant suggested to her the idea of having intercourse, whereupon she started to run. He grabbed her wrist; she started to yell. He then choked her, hit her in the neck and throat, first with his hand and fist and then with a rock. After he had removed her panties and shoes and had thrown them in the field, he raped her. Upon the conclusion of the act he rolled her over an embankment and put weeds over her so that she would not be noticed. Then he ran back to camp, set the table, and partook of a meal.

On the next day (Aug. 14, 1943) State Troopers came to the camp and questioned defendant. He was arrested; and, in a 14-page closely-typed statement, he made a complete confession to the District Attorney. He furnished the District Attorney with all the details of the incident; showed him where Elizabeth's body was; and where her panties and shoes had been thrown.

On August 15, 1943, at the Dutchess County Jail, the defendant was questioned by two psychiatrists — Drs. Cheney and Grover. The examination (as transcribed) covers 27 typewritten pages. Defendant described to the psychiatrists all the details of the incident in the same manner in which he had described them to the District Attorney on the previous day.

On August 20, 1943, at the District Attorney's request, an electroencephalogram (hereafter called an '' EEG '') was taken by Dr. Pacella. There is a dispute as to whether the EEG showed that defendant was an epileptic. Dr. Laidlaw (ultimately a witness for the People) was of the opinion that it was suggestive, but not conclusive, of epilepsy. Dr. Banay (for the defense) was of the opinion that it was indicative of epilepsy.

On August 26, 1943 defendant was indicted for the crime of murder in the first degree.

On October 19, 1943, at the request of Dr. Banay, a defense psychiatrist, defendant was examined neurologically by Dr. Laidlaw. That examination was essentially negative. At Dr. Laidlaw's request, an EEG was taken by Dr. Hofer. That EEG indicated that defendant was an epileptic. On November 21, 1943, after a conference between Dr. Banay and Dr. Laidlaw, the latter consented to testify for the defense at the trial.

The trial commenced on November 15, 1943. By November 22, 1943 the People had completed their case.

During the evening of November 22, 1943 a conference was held at which the following were present: the court, counsel for the People, counsel for the defense, Drs. Grover and Cheney (as psychiatrists for the People), and Drs. Laidlaw and Banay (as psychiatrists for the defense). Defense counsel wanted to have defendant plead guilty to murder in the second degree. The question at the conference was whether defendant, at the time of his commission of the act, knew its nature and quality and that it was wrong. Drs. Grover and Cheney were of the opinion that, since defendant described in detail all the facts leading up to and including the commission of the crime, defendant was not in an epileptic state at the time of the commission of the crime because, if he were, he would manifest a complete amnesia as to those facts. When Dr. Laidlaw (one of the defense psychiatrists) examined the transcript of the August 15, 1943 examination by Drs. Grover and Cheney and realized that defendant had then had a clear recollection of the details of the crime and was able to describe those details in sequence, Dr. Laidlaw changed his mind. At the time of the conference he was also of the opinion that the defense contention, namely: that at the time of the crime the defendant was in the throes of an epileptic quiver or seizure, was completely untenable; he agreed with the psychiatrists for the People that on August 13, 1943 the defendant knew the nature and quality of his act and knew it to be wrong. Only Dr. Banay was of the opinion that at the time of the crime the defendant was experiencing a psycho-motor epileptic attack and, therefore, did not know the nature and quality of his act or that it was wrong.

On November 23, 1943 defendant's plea of guilty to murder in the second degree was accepted. On December 6, 1943 he was sentenced to a term of 30 years to life imprisonment.

In August, 1946 defendant had his first recorded epileptic seizure. During the next 14 or 15 years he had a number of such attacks. Since about 1961 he has been under medication to prevent their recurrence.

Since 1954 defendant, on various grounds, has made a series of unsuccessful *coram nobis* applications to vacate the judgment of conviction (206 Misc. 950, affd. 285 App. Div. 1087; 8 Misc 2d 145, affd. 5 A D 2d 1016; 24 Misc 2d 902, affd. 13 A D 2d 684). The last-cited determination was reversed by the Court of Appeals (10 N Y 2d 361), with a direction that there be a hearing to determine whether, when defendant's plea of guilty of murder in the second degree was taken on November 23, 1943, he then had a "plausible defense" and whether insufficient consideration had been given to such defense.

At the conclusion of the hearing thus directed, the court below found as a fact that defendant was sane at the time of the commission of the crime; and, inferentially, it found that the defendant therefore did not have a plausible defense at the time of the guilty plea. I agree with those findings.

An epileptic is responsible for his actions, except when he is suffering from an epileptic disturbance (*People* v. *Barber,* 115 N. Y. 475). An epileptic suffers from an epileptic disturbance only a fraction of 1% of the time of his life.

In every case in which the Court of Appeals has considered the defense of epilepsy in capital cases (see, e.g., *People* v. *Furlong,* 187 N. Y. 198; *People* v. *Egnor,* 175 N. Y. 419; *People* v. *Higgins,* 5 N Y 2d 607), it was held, on the basis of the uncontradicted evidence of the experts, that substantial recollection of what happened was inconsistent with defendant having suffered any type of epileptic seizure and was convincing evidence of his responsibility for the crime.

At the hearing directed by the Court of Appeals in the case at bar, Dr. Laidlaw (called by the People) similarly testified: (1) that the absence of an amnesia and the presence of a detailed memory of the events ruled out any diagnosis of an epileptic equivalent at the time the crime was committed; and (2) that defendant's description of the consecutive steps of the crime and his conduct in taking the body and covering it up indicated that at that moment the defendant was aware that what he had done was wrong, that he might be apprehended and that he would have to conceal his deed. Dr. Laidlaw further testified that the defendant's confession to the District Attorney on the day after the crime and the transcript of the examination by Drs. Grover and Cheney two days after the crime showed that defendant had a clear, detailed sequential memory of the fatal incident and that, at the time of its occurrence, defendant's epileptic tendency had not been active.

Dr. Banay (called by the defense) was of the opinion and he testified: (a) that defendant had had epilepsy since he was

four years old and at the time of the crime he was experiencing a psychomotor epileptic attack; (b) that an epileptic, due to excitement, reacts with a furor state; (c) that defendant was in a furor state at the time of the crime and in that condition he could not evaluate the nature and quality of his act; (d) that this state can be of very short duration; (e) that it does not have to be associated with loss of memory or complete amnesia; and (f) that it is possible for a person to remember the details of what took place during an epileptic equivalent or psychomotor attack because such an attack does not block out consciousness.

Dr. Grover (called by the People) testified that there was no suggestion of epilepsy at the time of the commission of the crime because of the lack of amnesia and because of the clear, precise manner in which defendant, during his interview with the doctors on August 15, 1943, responded to their inquiries and recalled for them in detail how the crime had been committed.

The question on this appeal is not whether defendant was an epileptic before or after the commission of the crime, but whether defendant was in the throes of an epileptic seizure at the precise time of the commission of the crime, because even an epileptic is responsible for his acts not committed during a seizure. In my opinion, the great weight of the testimony given at the hearing, together with the weight of the unanimous determinations by the Court of Appeals in prior criminal prosecutions where the defense was epilepsy, is to the effect that, where the defendant has a full recollection of the facts surrounding the commission of the crime, he must be held to be legally sane and responsible for his acts.

In the case at bar defendant had a conscious recollection of every event which occurred prior to, during, and immediately after the commission of the crime. He remembered the number of visits he had made to Elizabeth. He remembered his thefts from the gas station with Elizabeth's brother. He remembered the exact conversation he had had with her at her home and on the road leading to the scene of the crime. He described in detail exactly what he had done with and to her, and the exact place where the crime had been committed. These details were all corroborated by the finding of the body in the place where he described it, and the finding of her torn panties and shoes near the body. He was also corroborated by the finding of the body in such a position as to show his efforts to conceal the crime, which he remembered. A reading of the questions put to him by the District Attorney on the day after the crime and of the questions put to him by the psychiatrists two days after the crime shows that none of the questions was leading or sug-

gestive, and that in both instances the defendant gave statements outlining the details of the crime from *his* recollection of the facts, and not from a reconstruction of the facts as the result of the questions.

In my judgment, under the circumstances here, Dr. Banay's opinion does not present a plausible defense that defendant was legally insane at the time of the commission of the crime.

Defendant also contends that the EEG of August 20, 1943, made by Dr. Pacella at the request of the District Attorney, which indicated that defendant had epilepsy, was suppressed at the conference of November 22, 1943 to defendant's prejudice. A District Attorney's suppression at a trial of evidence favorable to a defendant prevents a fair trial and constitutes reversible error (*People* v. *Savvides,* 1 N Y 2d 554). Here, however, it is not claimed that the EEG was suppressed at the trial, but only at the conference. In my opinion, at the November 22, 1943 conference, the EEG of August 20, 1943 was hardly material. The question at issue at that conference was not whether defendant was an epileptic, but whether he had been in the throes of a seizure at the time of the commission of the crime. It was the opinion of three psychiatrists, including one originally retained by the defense, that defendant had not been in the throes of a seizure on August 13, 1943 because he had a clear recollection of all the details in sequence, regardless of what any EEG showed. Under the circumstances, there was not and could not have been any prejudice to defendant.

The order denying defendant's application to vacate the judgment should be affirmed.

UGHETTA, CHRIST, BRENNAN and HILL, JJ., concur.

Order affirmed.